IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TAKEDA PHARMACEUTICAL COMPANY, LTD., and TAP PHARMACEUTICAL PRODUCTS INC., | ) ) ) | |
| Plaintiffs and Counterclaim-Defendants, | ) ) | **REDACTED PUBLIC VERSION** |
| v. | ) ) | |
| | ) | C.A. No. 06-033 (SLR) |
| TEVA PHARMACEUTICALS USA, INC., and TEVA PHARMACEUTICAL INDUSTRIES LTD., | ) ) ) | |
| Defendants and Counterclaim-Plaintiffs. | ) ) | |

**PLAINTIFFS TAKEDA PHARMACEUTICAL COMPANY'S AND
TAP PHARMACEUTICAL PRODUCTS'
OPENING CLAIM CONSTRUCTION MEMORANDUM**

OF COUNSEL:

Eric J. Lobenfeld
Tedd W. Van Buskirk
Arlene L. Chow
Dillon Kim
HOGAN & HARTSON LLP
875 Third Avenue
New York, New York 10022
212.918.3000

Philippe Y. Riesen
HOGAN & HARTSON LLP
Shinjuku Center Building, 46th Floor
25-1 Nishi-Shinjuku 1-chome
Shinjuku, Tokyo 163-0646 - Japan
(81) 3-5908-4070

Richard de Bodo
HOGAN & HARTSON LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
310.785.4600

*Attorneys for Takeda
Pharmaceutical Company Limited*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Mary B. Graham (#2256)
Rodger D. Smith II (#3778)
James W. Parrett, Jr. (#4292)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19801
302.658.9200

*Attorneys for Takeda Pharmaceutical
Company Ltd., and TAP
Pharmaceutical Products Inc.*

William F. Cavanaugh
Stuart E. Pollack
Chad J. Peterman
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
212.336.2000

*Attorneys for TAP*
*Pharmaceutical Products Inc.*

Original Filing Date: September 11, 2007
Redacted Filing Date: September 17, 2007

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT .......................................................................... 1

CONSTRUCTION OF THE ASSERTED CLAIMS OF THE '098 PATENT .............................. 3

CONSTRUCTION OF THE ASSERTED CLAIMS OF THE '321 PATENT .............................. 3

I.   CONSTRUCTION    OF    THE    CLAIM    TERM
     "PHARMACEUTICAL COMPOSITION" ........................................................... 4

     A.   The Dispute ................................................................................. 4

II.  PLAINTIFFS' CONSTRUCTION OF "PHARMACEUTICAL
     COMPOSITION" IS CONSISTENT WITH THE ORDINARY
     MEANING ....................................................................................... 6

     A.   The Specification Supports Plaintiffs' Construction and is
          Consistent with the Ordinary Meaning ........................................... 7

     B.   The Plain Language of the Claim, Including the "Wherein
          Clause," Supports Plaintiffs' Construction ...................................... 8

III. CONSTRUCTION    OF    THE    TERM    "WHEREIN    THE
     COMPOSITION    IS    MADE    UP    INTO    TABLETS    OR
     GRANULES AND THEN COATED BY A COATING AGENT" ...................... 10

     A.   The Dispute ................................................................................. 10

     B.   Construction Of The Term "Granules" ........................................... 11

          1.   The Dispute ......................................................................... 11

          2.   "Granules" Has a Plain and Ordinary Meaning Set
               Forth in Dictionaries .......................................................... 11

          3.   Teva Proffers No Reason to Ignore the Ordinary
               Meaning of "Granules" ....................................................... 12

IV.    CONSTRUCTION OF THE CLAIM TERM "THE AMOUNT OF THE BASIC INORGANIC SALT RELATIVE TO PARTS BY WEIGHT OF THE BENZIMIDAZOLE BEING ABOUT 0.3-20 PARTS BY WEIGHT" ...................................................................13

    A.    The Dispute ..............................................................................13

    B.    The Language is Straightforward, so Ordinary Meaning Should be Applied ...................................................................13

V.    CONSTRUCTION OF "THE BENZIMIDAZOLE COMPOUND BEING IN CONTACT WITH THE BASIC INORGANIC SALT EVENLY" .......................................................................................14

    A.    The Dispute ..............................................................................14

    B.    Plaintiffs' Construction Is Supported by the Intrinsic Record and the Understanding of One of Skill in the Art.........................16

    C.    Teva's Proposed Construction Must Be Rejected Because Homogenous Mixing Is Not Required .......................................19

CONCLUSION...................................................................................................20

## TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Abbott Labs. v. Sandoz, Inc.*,
  __F. Supp. 2d__, 2007 WL 1141635 (N.D. Ill. Apr. 16, 2007).........................................4

*Abbott Labs. v. Teva Pharms. USA, Inc.*,
  No. 02-CV-1512-KAJ, 2005 WL 1026746 (D. Del. Apr. 22, 2005)..................................9

*AFG Indus., Inc. v. Cardinal IG Co.*,
  375 F.3d 1367 (Fed. Cir. 2004).................................................................................9, 15

*Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*,
  344 F.3d 1186 (Fed. Cir. 2003)............................................................................................8

*Dow Chemical Co. v. Sumitomo Chemical Co., Ltd.*,
  257 F.3d 1364 (Fed. Cir. 2001)..........................................................................................19

*Duhn Oil Tool, Inc. v. Cooper Cameron Corp.*,
  474 F. Supp. 2d 1148 (E.D. Cal. 2007).............................................................................8

*Gillette Co. v. Energizer Holdings, Inc.*,
  405 F.3d 1367 (Fed. Cir. 2005)............................................................................................7

*Honeywell Intl. Inc. v. Universal Avionics Sys. Corp.*,
  488 F.3d 982 (Fed. Cir. 2007)............................................................................................14

*Johansson v. Rose Displays Ltd., Inc.*,
  No. 96-1410, 1997 WL43016 (Fed. Cir. Aug. 5, 1997) ..................................................19

*Johns Hopkins Univ. v. CellPro, Inc.*,
  152 F.3d 1342 (Fed. Cir. 1998)............................................................................................8

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)............................................................................................6

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002)............................................................................................9

*Vanguard Prods. Corp. v. Parker Hannifin Corp.*,
  234 F.3d 1370 (Fed. Cir. 2000).................................................................................9, 15

*Vivid Techs. v. Am. Sci. & Eng'g, Inc.*,
  200 F.3d 795 (Fed Cir. 1999)...............................................................................................7

<u>Other Authorities</u>

*Grant & Hackhs' Chemical Dictionary* 148 (5th ed. 1987) ..................................................... 6, 12

*McGraw-Hill Dictionary of Chemistry* 142 (1st ed. 1984)........................................................... 6

*Webster's Third New Int'l Dictionary of the English Language*
    *Unabridged* 1694 (Philip B. Gove, ed., 1986) ................................................................... 7

## PRELIMINARY STATEMENT

This case involves two patents concerning Takeda Pharmaceutical Company's ("Takeda's") and TAP Pharmaceutical Products' ("TAP's") blockbuster drug Prevacid®. The active ingredient in Prevacid is lansoprazole, which is a member of a class of drugs called proton-pump inhibitors ("PPIs"). PPIs prevent parietal cells in the stomach from pumping acid into the gastrointestinal tract. The discovery of lansoprazole, the method of stabilizing it, and commercial development of Prevacid was the result of a massive discovery and development program by Takeda and TAP. Because of their efforts, Prevacid, a safe, effective and stable pharmaceutical composition, is available to patients who suffer from a variety of common and debilitating diseases, such as, among others, duodenal ulcers, gastric ulcers, Gastroesophageal Reflux Disease (GERD), Zollinger-Ellison syndrome, and erosive esophagitis. Prevacid has been an enormous commercial success producing billions of dollars in annual sales for Plaintiffs.

U.S. Patent No. 4,628,098[1] (the "'098 Patent"), entitled "2-[2-PyridylMethylThio-(Sulfinyl)-] Benzimidazoles," claims the lansoprazole compound itself. It expires on May 10, 2009. It took Takeda almost two and a half years, after the synthesis of several hundred compounds, to invent lansoprazole. In total, Takeda synthesized and screened more than 400 compounds before selecting lansoprazole as its leading drug candidate. There are trillions of compounds having chemical structures similar to lansoprazole. Finding a compound among these trillions that is active, stable, has few side effects, a favorable ADME (adsorption, distribution, metabolism, and elimination profile) and an acceptable toxicity profile was a monumental achievement. In fact, after almost 25 years of active research on PPIs by more than

---

[1]    A copy of the '098 Patent is attached hereto as Exhibit 1.

40 pharmaceutical companies, only five PPIs have been found safe and effective enough to warrant FDA approval.

There are no claim construction disputes concerning the '098 Patent, and Teva concedes that its proposed generic product will infringe the '098 Patent.

The second patent in dispute, U.S. Patent No. 5,045,321[2] ("the '321 Patent"), expires on September 3, 2008, before the '098 Patent expires. Entitled "Stabilized Pharmaceutical Composition and its Production," it claims a lansoprazole pharmaceutical composition that is stabilized by magnesium carbonate, a basic inorganic salt of magnesium. While the discovery of lansoprazole was an enormous scientific advance, Takeda's scientists faced a significant hurdle in developing it into a useful pharmaceutical product. Lansoprazole was unstable as a solid powder—susceptible to degradation by heat, moisture, light and decreasing pH (increasing acidity). As with virtually every active pharmaceutical ingredient, lansoprazole could not be administered on its own, but needed to be included in a pharmaceutical formulation suitable for administration to a patient. Unfortunately, many ingredients commonly used in pharmaceutical compositions, including enteric-coating materials (which are necessary to allow lansoprazole to pass through the stomach into the intestine where its needed) actually contributed further to the degradation of lansoprazole.

To develop a commercially viable lansoprazole product, it was necessary for the inventors of the '321 Patent to develop it into a stable pharmaceutical formulation. The inventors of the '321 Patent solved the degradation problems of lansoprazole by discovering that certain basic inorganic salts of magnesium and calcium, especially magnesium carbonate ($MgCO_3$), stabilize lansoprazole and significantly reduce degradation. (Ex. 2, '321 Patent, col. 1,

---

[2]    A copy of the '321 Patent is attached hereto as Exhibit 2.

ll. 33-36).  By formulating pharmaceutical compositions in which the magnesium carbonate is present in certain amounts and where lansoprazole is in contact with the magnesium carbonate evenly, the inventors were able to obtain stable pharmaceutical compositions with commercially viable shelf lives.  Prevacid, which practices the '321 Patent, has a three-year shelf life.

Unlike the '098 Patent, Teva disputes that it infringes the '321 Patent.  Teva attempts to "define away" its infringement of the '321 Patent through a claim construction that wholly departs from the plain meaning of the five disputed terms.

As described further below, there are five claim terms at issue in the '321 Patent. The Court should adopt the construction for the patents proffered by Plaintiffs.

### CONSTRUCTION OF THE ASSERTED CLAIMS OF THE '098 PATENT

On August 10, 2007, the parties exchanged their respective proposed constructions of the terms of the '098 Patent.[3]  The parties agree that all the claim terms of the asserted claim (claim 10) are to be given their plain and ordinary meaning.  There is no dispute concerning claim construction of the '098 Patent.[4]

### CONSTRUCTION OF THE ASSERTED CLAIMS OF THE '321 PATENT

Plaintiffs contend that Teva's proposed generic product infringes claim 2 of the '321 Patent. Claim 2 depends from claim 1.  On August 10, 2007, the parties exchanged their respective proposed construction of the disputed terms of the '321 Patent.[5]  Claim 2, rewritten in independent form with the terms of independent claim 1, recites (the claim terms requiring construction are in italics and bold):

---

[3]    A true and correct copy is attached hereto as Exhibit 3.

[4]    If a dispute arises, Plaintiffs reserve the right to present arguments on contested issues.

[5]    A true and correct copy is attached as Exhibit 4.

2.  A ***pharmaceutical composition***, *wherein the composition is made up into tablets or* ***granules*** *and then* ***coated by a coating agent***, which comprises an effective amount of the anti-ulcer compound 2-[[3-methyl-4-(2,2,2-trifluoroethoxy-2-pyridyl]methylsulfinyl]benzimidazole [lansoprazole], and magnesium carbonate; ***the amount of magnesium carbonate relative to parts by weight of the benzimidazole compound [lansoprazole] being about 0.3-20 parts by weight***; *the benzimidazole compound [lansoprazole] being in contact with the basic inorganic salt evenly*.

(col. 17, l. 63 - col. 18, l. 31 (emphasis added)).

## I.     CONSTRUCTION     OF     THE     CLAIM     TERM "PHARMACEUTICAL COMPOSITION"

### A.     The Dispute

| TAP AND TAKEDA'S CONSTRUCTION | TEVA'S CONSTRUCTION |
|---|---|
| A medicinal drug product in a state suitable for administration to a patient. | The mixture of lansoprazole with a basic inorganic salt of magnesium and/or calcium, which many contain any necessary additives that are used to make the tablet or granules but does not include any excipients used for coating the pharmaceutical composition. |

The term "pharmaceutical composition" frequently occurs in patent claims.  A search of the PTO's database showed that more than 40,000 patents contained this term in their claims.  (Ex. 5, Search of U.S.P.T.O. database performed on 9/11/2007, available at http://patft.uspto.gov/.)  A "pharmaceutical composition" has a long-known and well-understood ordinary meaning – it means "a medicinal drug product in a state suitable for administration to a patient."  Courts have construed the term "pharmaceutical composition" consistent with Plaintiffs' construction, including a recent case where Teva's own expert on claim construction, Dr. Chambliss, testified.  *See Abbott Labs. v. Sandoz, Inc.*, __F. Supp. 2d__, 2007 WL 1141635, at *17 (N.D. Ill. Apr. 16, 2007) ("[E]ach term is assigned its plain and ordinary meaning as understood by a skilled artisan. The term 'pharmaceutical composition' means an aggregated product formed from two or more substances for use as a drug in medical treatment.").

Moreover, nowhere in the '321 patent or its prosecution history was the term "pharmaceutical composition" redefined to mean something different from its ordinary meaning.

Plaintiffs' expert, Professor Stephen Byrn, confirms that a person skilled in the art would give the term "pharmaceutical composition" its ordinary and customary meaning, *i.e.*, that it means "a medicinal drug product in a state suitable for administration to a patient." (Declaration of Stephen R. Byrn, Ph.D. dated 9/11/07 ("Byrn Decl."), at ¶¶ 14-26).

**REDACTED**

Teva attempts to redefine the term "pharmaceutical composition" to exclude the enteric coating or any other coatings or "subcoatings."       **REDACTED**

But claim 2 is directed to real coated granules that would actually be manufactured and sold by pharmaceutical companies, and not to intermediate

products created during manufacturing or parts of products that include some ingredients but not others. Teva's attempt to ignore the ordinary, well-accepted meaning of "pharmaceutical composition" should be rejected.

## II. PLAINTIFFS' CONSTRUCTION OF "PHARMACEUTICAL COMPOSITION" IS CONSISTENT WITH THE ORDINARY MEANING

Plaintiffs' proposed construction of "pharmaceutical composition" is consistent with the ordinary meaning of the term, as set forth in technical and non-technical dictionaries. Chemical dictionaries explain what a "composition" is: "The elements or compounds forming a material …." *Grant & Hackhs' Chemical Dictionary* 148 (5th ed. 1987) (Byrn Decl., at Ex. E); *McGraw-Hill Dictionary of Chemistry* 142 (1st ed. 1984) (Byrn Decl., at Ex. F). And these dictionaries define "pharmaceutical" as "pertaining to drugs." *Grant & Hackhs'* at 437 (Byrn Decl., at Ex. E). Ordinary dictionaries provide similar definitions: "composition" is "an aggregate, mixture, mass, or body formed by combining two or more elements or ingredients," and "pharmaceutical" is "of or relating to pharmacy or pharmacists." *Webster's Third New Int'l Dictionary of the English Language Unabridged* 1694 (Philip B. Gove, ed., 1986) ("*Webster's Unabridged Dictionary*") (Byrn Decl., at Ex. G). And the Federal Circuit has recognized the value of dictionaries to define commonly-used claim terms like "pharmaceutical composition." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1322-23 (Fed. Cir. 2005) (*en banc*) ("[J]udges are free to consult dictionaries and technical treatises at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.").

Moreover, claim 2 recites "[a] pharmaceutical composition …. which ___comprises___…" (emphasis added), where "pharmaceutical composition" is the preamble and

"comprises" is the transitional phrase.  The transitional phrase "comprises" is a term of art in patent claims which means that the claim is "open" *i.e.*, that the claim may include any number of elements or structures in addition to the enumerated limitations in the claim.  *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1371 (Fed. Cir. 2005); *see also Vivid Techs. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 811 (Fed Cir. 1999) (citations omitted).  By using the term "comprises" in the claim language and the specification, claim 2 encompasses any pharmaceutical composition, regardless of content or structure, that otherwise meets the limitations of the claim.

### A.    The Specification Supports Plaintiffs' Construction and is Consistent with the Ordinary Meaning

The specification of the '321 Patent is also consistent with Plaintiffs' proposed construction of the term pharmaceutical composition as "a medicinal drug product in a state suitable for administration to a patient," and is contrary to Teva's proposed construction.  The '321 Patent specification states that "[t]he pharmaceutical composition of the invention can be *orally administered for the treatment of digestive ulcers* in mammals in admixture with pharmacologically acceptable carriers, vehicles, diluents and so forth and *in the form of capsules, tablets, granules* and some other dosage forms, as mentioned hereinabove."  (Ex. 2, '321 Patent, col. 10, ll. 43-38 (emphasis added)).  This language confirms that, consistent with Plaintiffs' construction, the claimed pharmaceutical composition is intended to be a medicinal drug product in a state suitable for administration to a patient.  In contrast, Teva's proposed construction of "pharmaceutical construction," which would exclude all coatings, enteric or otherwise, would render the "pharmaceutical composition" unsuitable for use as a treatment.

Teva's construction of "pharmaceutical composition" as excluding any coating is also directly contrary to the specification of the '321 Patent, which describes granules with an

enteric coating as a "composition." (Ex. 2, col. 14, ll. 29-37.) The specification refers to "compositions of the invention" as tablets, granules, or capsules. (Ex. 2, col. 17, ll. 35-61.) Thus, the specification is consistent with "pharmaceutical composition" as a composition comprising the elements described in claim 2 of the '321 Patent, *i.e.*, a tablet or granule including at least lansoprazole, magnesium carbonate and a coating agent in a state suitable for administration to a patient.

<b>B.     The Plain Language of the Claim, Including the "Wherein Clause," Supports Plaintiffs' Construction</b>

Claim 2 recites a "pharmaceutical composition, wherein the composition is made up into tablets or granules and then coated by a coating agent." The phrase "wherein the composition is made up into tablets or granules and then coated by a coating agent" is an example of a commonly-occurring element in patent claims called a "wherein" clause. *Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186, 1193 (Fed. Cir. 2003); *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1357 (Fed. Cir. 1998). A "wherein" clause provides a description of the properties of a claimed composition. *Duhn Oil Tool, Inc. v. Cooper Cameron Corp.*, 474 F. Supp. 2d 1148, 1165 (E.D. Cal. 2007).

In claim 2, the "wherein" clause provides a description of the "pharmaceutical composition" as including tablets or granules and coatings. It does not limit the claim to the process by which the pharmaceutical composition is made. *See Johns Hopkins*, 152 F.3d at 1350, 1359 ("[T]he [district] court concluded that the 'wherein' clause was an 'attempt to describe a specific physical entity ….' [T]he district court's construction of the 'wherein' clause and its subsequent grant of summary judgment of infringement are affirmed."). Teva ignores the law and treats the terms in the wherein clause as if they are steps in a method claim that must be

performed upon the pharmaceutical composition, rather than descriptions of the pharmaceutical composition. Teva's method-step claim construction approach is wrong.

Teva contends that because examples in the '321 Patent describe a mixture of lansoprazole and magnesium carbonate that is made as a separate step in the manufacturing process, the claim should be limited by importing the process used in the examples into claim 2. This is improper. The presumption in favor of giving claim terms their plain and ordinary meaning cannot be rebutted "simply by pointing to the preferred embodiment...." *Abbott Labs. v. Teva Pharms. USA, Inc.*, No. 02-CV-1512-KAJ, 2005 WL 1026746, at *3 (D. Del. Apr. 22, 2005), *citing Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1327 (Fed. Cir. 2002). Product claims should not be limited by processes described in the specification. *AFG Indus., Inc. v. Cardinal IG Co.*, 375 F.3d 1367, 1370 (Fed. Cir. 2004) ("Although discussing the method of depositing layers of zinc oxide, this court recognizes that the '532 claim is a product claim that covers this inventive glass structure however it is made or however it is used."); *Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372 (Fed. Cir. 2000) ("A novel product that meets the criteria of patentability is not limited to the process by which it was made.").

Moreover, the oft-used patent-claim phrase "pharmaceutical composition" does not require the mental gymnastics that Teva applies to it. Indeed, a similar tortured construction proposed by Teva was rejected in *Abbott*, 2005 WL 1026746, at *9-10. There, the patentee proposed that "composition" meant "a combination of various elements or ingredients." *Id.* at *10. Teva proposed that "composition" meant "a drug composition, wherein an inert carrier is a support for the micronized drug and hydrophilic polymer, and which can then take the form of granulates, tablets and capsules." *Id.* This Court rejected Teva's construction, ruling that a

"composition" means "an aggregate, mixture, mass, or body formed by combining two or more elements or ingredients." *Id.* (*citing Webster's Unabridged Dictionary* at 446).

For all of these reasons, the Court should apply the plain and ordinary meaning to the term "pharmaceutical composition" and should interpret the term to mean "a medicinal drug product in a state suitable for administration to a patient."

### III.    CONSTRUCTION OF THE TERM "WHEREIN THE COMPOSITION IS MADE UP INTO TABLETS OR GRANULES AND THEN COATED BY A COATING AGENT"

#### A.    The Dispute

| TAP AND TAKEDA'S CONSTRUCTION | TEVA'S CONSTRUCTION |
|---|---|
| "Coated by a coating agent" refers to covering a tablet or granule with a pharmaceutically acceptable coating. | "Coated by a coating agent" means the tablets or granules containing the pharmaceutical composition are coated with a material that masks the taste or provides enteric or sustained release properties. |

As noted above, the term "wherein the composition is made up into tablets or granules and then coated by a coating agent" is a wherein clause used to describe characteristics of the claimed "pharmaceutical composition." The term "coated by a coating agent" means "covering a tablet or granule with a pharmaceutically acceptable coating." (Byrn Decl., at ¶¶ 27-30). Plaintiffs' construction is consistent with the ordinary dictionary definition of "coating," which is "a layer of any substance used as cover, protection, decoration, or finish." *Webster's Unabridged Dictionary*, at 433 (Byrn Decl., at Ex. G). Plaintiffs' construction is also consistent with the '321 Patent's specification, which states that "granules **may be** coated by a per se known method for the purpose of masking the taste or providing them with enteric or sustained release property." (col. 10, ll. 3-6; emphasis added). The use of the word "may" and the reference to "per se known" methods in the sentence indicates the coating methods identified in the '321 Patent are illustrative rather than exclusive, and is consistent with Plaintiffs' construction.

But Teva disputes the meaning of this wherein clause, and contends that the clause actually imposes method limitations where the coating agent must be applied to the "pharmaceutical composition." Teva then uses this method construction to conclude that the claimed "pharmaceutical composition" does not include the magnesium carbonate that is mixed with the lansoprazole in Teva's product, or the enteric coating layer. For the reasons described above concerning construction of "pharmaceutical composition," Teva's construction should be rejected. Teva's convoluted construction is simply an attempt to avoid infringement by improperly importing process limitations from the examples of the '321 Patent into the claim.

### B.    Construction Of The Term "Granules"

#### 1.    The Dispute

| TAP AND TAKEDA'S CONSTRUCTION | TEVA'S CONSTRUCTION |
|---|---|
| The term "granules" refers to small pellets that are typically combined with other granules into a tablet or capsule. | The term "granules" means either an irregularly shaped or a spheroid shaped mass of particles made up of a pharmaceutical composition, which also may contain additives. |

#### 2.    "Granules" Has a Plain and Ordinary Meaning Set Forth in Dictionaries

Plaintiffs construe the term "granules" consistent with its ordinary meaning – *i.e.,* "small pellets that are typically combined with other granules into a tablet or capsule." This construction is consistent with the ordinary and plain meaning of the word, as defined in technical dictionaries: "**granules** … (2) Medicinal substances in small pellets." *Grant & Hackhs' Chemical Dictionary* 268 (5th ed. 1987) (Byrn Decl., at Ex. E). It is also how persons of skill in the art define the term. (Byrn Decl., at ¶¶ 31-39). The reference to the term "tablet" or "capsule" in Plaintiffs' proposed construction is a reference to the larger units, *i.e.*, dosage forms, that granules are used to make.

11

According to the '321 Patent's specification, granules may be created in different ways: "Granules are produced by extrusion … *or* by coating with nonpareils . . . ." (col. 10, ll. 24-33 (emphasis added)). The specification therefore contemplates different forms of granules, all of which share the characteristic of being small pellets. The specification of the '321 Patent further recognizes that a granule that is coated with an enteric coating is also a granule. (col. 14, ll. 18-26). Therefore, the specification of the '321 Patent is not restrictive, and simply uses the word granule to encompass any form of small pellet. *See Abbott*, 2005 WL 1026746, at *9 (*citing Webster's Unabridged Dictionary*, at 989, construing the similar term "granulate" as a synonym of "granule," and applying its ordinary definition of "one of a number of particles forming a larger unit.").

### 3.    Teva Proffers No Reason to Ignore the Ordinary Meaning of "Granules"

Teva proposes that the term "granules" be defined as "either an irregularly shaped or a spheroid shaped mass of particles made up of a pharmaceutical composition, which also may contain additives." But nothing in the '321 Patent requires that a "granule" must have any particular shape at all. And nothing in the specification limits "granules" to sugar spheres with only a drug layer on them, without the magnesium carbonate and enteric coatings applied. Indeed, the examples of "granules" in the '321 Patent are granules with magnesium carbonate and enteric coatings.

Since Teva cites nothing in the specification or prosecution history that redefined the term "granules," its ordinary meaning of "medicinal substances in small pellets," and in the context here, "small pellets that are typically combined with other granules into a tablet or capsule," should apply.

**IV.    CONSTRUCTION OF THE CLAIM TERM "THE AMOUNT OF THE BASIC INORGANIC SALT RELATIVE TO PARTS BY WEIGHT OF THE BENZIMIDAZOLE BEING ABOUT 0.3-20 PARTS BY WEIGHT"**

**A.    The Dispute**

| TAP AND TAKEDA'S CONSTRUCTION | TEVA'S CONSTRUCTION |
|---|---|
| The phrase "the amount of the basic inorganic salt relative to parts by weight of the benzimidazole compound being about 0.3-20 parts by weight" means that the ratio of magnesium carbonate to lansoprazole by weight in the pharmaceutical composition is between 0.3 and 20. | The phrase "the amount of the basic inorganic salt relative to parts by weight of the benzimidazole compound being about 0.3-20 parts by weight" means the weight of the basic inorganic salt that is in even contact with the benzimidazole falls between about 0.3 to 20 parts by weight. |

**B.    The Language is Straightforward, so Ordinary Meaning Should be Applied**

Plaintiffs construe the phrase "the amount of the basic inorganic salt relative to parts by weight of the benzimidazole compound being about 0.3-20 parts by weight" to have its ordinary meaning – *i.e.*, it means that the ratio of magnesium carbonate to lansoprazole by weight *in the pharmaceutical composition* is between 0.3 to 20.  This is also how persons of skill in the art would understand the phrase.  (Byrn Decl., at ¶¶ 40-44).  It is hard to think of a phrase that could be simpler to construe.

Teva proposes a tortured construction that injects the words "that is in even contact" although these words appear nowhere in the phrase.  The limitation requiring that "the benzimidazole compound being in contact with the basic inorganic salt evenly" appears at the end of the claim, separated by a semi-colon from the limitation dealing with the ratio of magnesium carbonate and lansoprazole in the pharmaceutical composition.  The use of the semi-colon to separate the two claim limitations means that these are separate and distinct limitations.  Yet despite the express separation between the two limitations, Teva proposes a construction that would merge them together: *i.e.*, "the weight of basic inorganic salt *that is in even contact* with

13

the benzimidazole to fall between about 0.3 to 20 parts by weight." This is contrary to the plain language and syntax of the claim language.

Moreover, it is lansoprazole that needs to be in contact evenly with magnesium carbonate, because it is lansoprazole that may degrade. Whether there is excess magnesium carbonate that does not contact lansoprazole is irrelevant, since magnesium carbonate is very stable. And the claim contemplates excess magnesium carbonate: up to 20 times magnesium carbonate is permitted.

**REDACTED**

V. **CONSTRUCTION OF "THE BENZIMIDAZOLE COMPOUND BEING IN CONTACT WITH THE BASIC INORGANIC SALT EVENLY"**

A. **The Dispute**

| TAP AND TAKEDA'S CONSTRUCTION | TEVA'S CONSTRUCTION |
|---|---|
| The phrase " the benzimidazole compound being in contact with the basic inorganic salt evenly" means a mixture of the benzimidazole compound in contact with the basic (*i.e.*, alkaline) inorganic salt in a uniformly basic environment | The phrase "the benzimidazole compound being in contact with the basic inorganic salt evenly" means the benzimidazole compound and the inorganic salt are mixed homogenously together |

Unlike the other terms in dispute, the phrase "the benzimidazole compound being in contact with the basic inorganic salt evenly" does not have an ordinary meaning to one of skill in the art. (Byrn Decl., at ¶ 45) ("In my over 35 years of experience in the pharmaceutical field, I never heard the term used until I read the '321 Patent."). When a phrase has no ordinary meaning one looks to the specification and prosecution history to decipher its meaning. *See e.g., Honeywell Intl. Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 991 (Fed. Cir. 2007) ("Without a customary meaning of a term within the art, the specification usually supplies the

best context for deciphering claim meaning."). In the case of the '321 Patent, these sources show that the inventors of the '321 Patent used the phrase "the benzimidazole compound being in contact with the basic inorganic salt evenly" to describe a mixture between magnesium carbonate (a basic, or alkaline, inorganic salt) and lansoprazole with sufficient contact to create a uniformly basic environment (which has the ultimate effect of stabilizing lansoprazole, which is sensitive to an acidic environment).

Teva's construction, which requires that magnesium carbonate and lansoprazole be "mixed homogenously together" suffers from a flaw that the Federal Circuit has repeatedly cautioned against – reading process limitations from the specification into a product claim. *See AFG Indus.*, 375 F.3d at 1370 ("Although discussing the method of depositing layers of zinc oxide, this court recognizes that the '532 claim is a product claim that covers this inventive glass structure however it is made or however it is used."); *Vanguard Prods.*, 234 F.3d at 1372 ("A novel product that meets the criteria of patentability is not limited to the process by which it was made."). Teva's construction is belied by the patent specification, which describes methods other than homogenous admixing to achieve "the benzimidazole compound being in contact with the basic inorganic salt evenly." '321 Patent, col. 9, ll. 62-65 ("magnesium . . . may be **added** [not homogeneously admixed] to a mixture of the benzimidazole compound [lansoprazole] and the additives") (emphasis added). Moreover, the specification makes it clear that the "method of admixing is optional" as long as magnesium carbonate "can finally be in contact with the basic inorganic salt of magnesium . . . evenly." *Id*. at col. 9, ll. 56-59. Thus, contrary to Teva's proposed construction, the specification expressly rejects a homogenous mixing requirement.

### B.    Plaintiffs' Construction Is Supported by the Intrinsic Record and the Understanding of One of Skill in the Art

Plaintiffs' construction flows from the stated purpose of claim 2—to stabilize lansoprazole, which is acid sensitive, by having it "in contact with the basic inorganic salt [magnesium calcium] evenly.    The purpose of the magnesium carbonate is to make the environment surrounding the lansoprazole basic (alkaline) in order to stabilize it.  (Byrn Decl., at ¶ 49).  From the specification, one of skill in the art knows that the invention of the '321 Patent includes non-homogenous mixtures of lansoprazole and magnesium carbonate, as long as "contact with the basic inorganic salt evenly" is otherwise achieved.  *See* '321 Patent, col. 9, ll. 56-59, 62-65.    "Contact with the basic inorganic salt evenly" is achieved by lansoprazole/magnesium mixtures that create an alkaline environment.  (Byrn Decl., at ¶ 49).  But it does not require each particle of lansoprazole to be in physical contact with a particle of magnesium carbonate, nor does it require homogenous mixing, to achieve an even alkaline environment.

"Contact" means "association or relationship (as in physical or … communication) <students or teachers in daily contact>" and "a condition or an instance of meeting, connecting, or communicating."  *Webster's Unabridged Dictionary*, at 490 (Byrn Decl., at Ex. G).  "Contact with the basic inorganic salt evenly "means more than physical touching: "contact" includes "immediate proximity or association" and "to communicate with." *The Random House Dictionary of the English Language, Unabridged* 437 (Stuart B. Flexner, ed., 2d ed. 1987) (Ex. 6).  For example, two people on the telephone are said to be in contact even though they are not physically touching.  A cell phone is in contact with the cellular phone tower through radio waves although they are not physically touching.  Also a magnet (through its

magnetic field) can be in contact with paper clip (and actually move it) without physically touching it.

Similarly, skilled drug formulators in the 1980s would have been familiar with the physical complexity of solid drug formulations. They would have understood "contact" between two components in a formulation to include close enough proximity to influence each other. (Byrn Decl., at ¶ 48). It was well understood at the time of the invention of the '321 Patent that, similar to a magnet/paper clip interaction, ingredients within a pharmaceutical formulation could influence each other even if they were not touching. (*Id.* at ¶ 46-48). In the 1980s, there were a number of known solid-state reactions, including proton interactions, which involved the transfer of protons between ingredients in a solid formulation even when they were not touching. This transfer of protons creates an alkaline environment for the lansoprazole that is either in direct physical contact or in proximate contact. (*Id.*).

# REDACTED

The '321 Patent specification further supports this concept of "contact with the basic inorganic salt evenly" through proximity. In particular, the specification teaches that there will be some water present in the composition. (col. 9, ll. 54-56; Byrn Decl., at ¶¶ 49-50 ("The moisture amount in the composition is preferably about 6-60%, more preferably about 20-40% as

equibrium [sic] relative humidity (E.R.H.).")).   The specification also describes the basic inorganic salts (such as magnesium carbonate) in the '321 Patent as having the ability to show "basicity (pH of not less than 7) when they are in the form of a 1% aqueous solution or suspension."  (col. 9, ll. 21-24).  Skilled drug formulators in the 1980s would have naturally connected the requirement that the basic inorganic salt produce a basic environment together with the teaching that there is water in the formulation, and would have understood that the water is used as a vehicle to establish contact in order to create a basic environment surrounding the lansoprazole.  (Byrn Decl., at ¶ 51).

Drug formulators often worked with solid state compositions, and had an appreciation for and knowledge of the complexities inherent in describing solid state systems. For example, in example 5 of '321 Patent, the composition described in the example includes a total of 9 different components, only two of which are lansoprazole and the basic inorganic salt, magnesium carbonate.  (*Id*.).   In a multi-component system having a variety of different components mixed together, the lansoprazole being "in contact with the basic inorganic salt evenly" does not and cannot require that all the lansoprazole be homogenously mixed with the magnesium carbonate.

The dictionary defines "even" as "uniform in action, character, or quality." *Random House Dictionary of the English Language Unabridged*, at 670 (Ex. 6).  In the context of the '321 Patent, "in contact with the basic inorganic salt evenly" means that the microenvironment is "uniformly basic" in that all or substantially all of the lansoprazole is in a pH environment that can be characterized as basic.

### C.    Teva's Proposed Construction Must Be Rejected Because Homogenous Mixing Is Not Required

Teva's proposed construction requires a homogenous mixture.  This construction improperly imports limitations from the specification into the claim, and ignores portions of the specification where mixing other than homogeneous mixing is disclosed.

It is a fundamental principle of claim construction that claims drawn to products are not limited by methods disclosed in the specification, such as the admixing method described in the specification.  The specification distinguishes the physical structure of being "in contact with the basic inorganic salt evenly" from one of the methods of preparing the compositions—by admixing:  "The method of admixing is *optional* if the benzimidazole compound can finally be in contact with the basic inorganic salt of magnesium and/or of calcium evenly" (col. 9, ll. 56-59 (emphasis added)).  And other methods of achieving "even contact" are detailed: "…the basic inorganic salt of magnesium and/or of calcium may be added to a mixture of the benzimidazole compound and the additives as prepared by preliminary admixing."  (col. 9, ll. 60-66) (emphasis added)).

The language "homogenous admixing" and "in contact with the basic inorganic salt evenly" are separately used in the specification, and so should be understood to mean different things.  If the patentee had intended the claim to be limited to homogenous admixtures, the patentee would have written that requirement into the claims.  The fact that a specification uses two different phrases in its description is consistent with "different meanings of these phrases." *Dow Chem. v. Sumitomo Chem. Co.,* 257 F.3d 1364, 1377 (Fed. Cir. 2001); *see also Johansson v. Rose Displays Ltd., Inc.,* No. 96-1410, 1997 WL43016, at *3 (Fed. Cir. Aug. 5, 1997) (unpublished decision not citable as precedent) ("The mere fact that the two terms are used together in the specification cannot, in light of the above considerations, prevent the two

19

different words from having different meanings.")    Here, the patentee used the term "homogeneous admixing" as an example of a method to achieve "contact with the basic inorganic salt."  But the admixing method examples can not limit the claimed products to only those products made by the admixing method.   Instead, Teva's method-limited construction should be rejected.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court adopt Plaintiffs' claim construction.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/  James W. Parrett, Jr.*
Jack B. Blumenfeld (#1014)
Mary B. Graham (#2256)
Rodger D. Smith II (#3778)
James W. Parrett, Jr. (#4292)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19801
302.658.9200

*Attorneys for Takeda Pharmaceutical
Company Ltd., and TAP
Pharmaceutical Products Inc.*

OF COUNSEL:

Eric J. Lobenfeld
Tedd W. Van Buskirk
Arlene L. Chow
Dillon Kim
HOGAN & HARTSON LLP
875 Third Avenue
New York, New York 10022
212.918.3000

Philippe Y. Riesen
HOGAN & HARTSON LLP
Shinjuku Center Building, 46th Floor
25-1 Nishi-Shinjuku 1-chome
Shinjuku, Tokyo 163-0646 - Japan
(81) 3-5908-4070

Richard de Bodo
HOGAN & HARTSON LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
310.785.4600

*Attorneys for Takeda*
*Pharmaceutical Company Limited*

William F. Cavanaugh
Stuart E. Pollack
Chad J. Peterman
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
212.336.2000

*Attorneys for TAP*
*Pharmaceutical Products Inc.*

September 11, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2007, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to the following:

> Karen L. Pascale, Esquire
> Karen E. Keller, Esquire
> YOUNG CONAWAY STARGATT & TAYLOR, LLP

Additionally, I hereby certify that true and correct copies of the foregoing was caused to be served on September 17, 2007 upon the following individuals in the manner indicated:

**BY E-MAIL**

Karen L. Pascale, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

**kpascale@ycst.com**

**BY E-MAIL**

John L. North, Esquire
SUTHERLAND ASBILL & BRENNAN LLP
**john.north@sablaw.com**

Jeffrey J. Toney, Esquire
SUTHERLAND ASBILL & BRENNAN LLP
**jeffrey.toney@sablaw.com**

Laura Fahey Fritts, Esquire
SUTHERLAND ASBILL & BRENNAN LLP
**laura.fritts@sablaw.com**

Jeffrey D. Blake, Esquire
SUTHERLAND ASBILL & BRENNAN LLP
**jeffrey.blake@sablaw.com**


*/s/ James W. Parrett*
_____
James W. Parrett, Jr. (#4292)